Our only case of the day is United States v. Burgos-Coronado, number 19-60294. Mr. Davis, you showed up first, but you also get to go first. You can proceed. Thank you, Your Honor. Good morning, and may it please the court. Our appeal challenges the district court's denial of a motion to suppress, and the central issue is whether the officers on the scene of the driver's license checkpoint had objectively reasonable suspicion necessary to convert a brief limited driver's license check into an investigatory detention of Mr. Molina and his passengers. Mr. Davis, you could help me factually with something. I looked at the transcript of the suppression hearing and also at Judge Brown's order. There are references to this conversation by the driver in Spanish to the two passengers, and in her order and also in the officer's testimony in the order, she just writes that after that Spanish language reference and rolling down the window, the two passengers handed ID. What should we make of this record insofar as whether it shows that there was a request for the IDs from the passengers or whether they just offered them after the driver said something in Spanish? I'm not sure. Thank you, Your Honor. I'm not sure I have the it's a little confusing from the record. In the preliminary hearing, Mr. Trooper Bell testified that that after the trooper Minga, who I believe was his colleague, rolled the window down and asked Mr. Molina who his passengers were in the backseat. And at that time, Mr. Molina spoke to them in Spanish. And the testimony at the preliminary hearing, as I understand it, was that he rolled that back window down. And the two in the two passengers in the backseat offered up their identifications. Now, at the suppression hearing, that's he testified that that Trooper Bell testified. The trooper Minga requested those identifications from from him. And so there was a little bit of conflicting conflicting testimony about whether it was offered up or whether it was actually requested. Our position finding the judge Brown make any fact finding in any of her. I didn't see in the transcript. I didn't see it in the written order. But, you know, the record better than I. Is there anything like that? I was not aware of it, of an explicit fact finding in that regard. Your Honor, Judge Brown relied appeared to rely on the testimony of Trooper Bell at the suppression hearing that the seating arrangement was was such that he was concerned about human trafficking. Now, our position is that these checkpoint type encounters are seizures. They are inherently seizures. They are allowable seizures up to a point. And it's a limited it's a limited point. If at any point during this, this this temporary authorized seizure, if the stated programmatic purpose of the stop has been achieved and there's no reasonable suspicion, objectively reasonable suspicion of criminal behavior going on. And then then they should be free to leave. Mr. Molina and his passengers were never free to leave. In this case, Mr. Molina had his driver's license seized at the very beginning of the encounter, basically instantly. And it was never returned to him. So I Trooper Bell tried to testify at the preliminary hearing that this was just a casual encounter and they were free to leave. He ultimately acknowledged at the suppression hearing that if he had left, they would have pursued they would have pursued him. So he was never free to leave. And our position is, if at any point in this encounter that stated purpose has been completed and there's no objectively reasonable justification for going on, then the encounter is unlawful. And that occurs whether and whether that occurs in five seconds or 10 seconds or 30 seconds is really of no consequence. This court has recognized that these types of checkpoint encounters. This is similar in a lot of ways to an immigration checkpoint. And in that context, this court noted in the Machuca Barrera case in 2001 that the permissible duration of an immigration checkpoint is brief, even noting that the Supreme Court and its Martinez fuerte opinion considered the brevity of these stops as basically a central rationale in holding these types of checkpoints constitutional. We urge that the district court adopt when you say it's similar to immigration checkpoints. So you were you accepted the district court's use of immigration checkpoint law to it to a degree. I don't know that there's a I haven't been able to put my hands on a lot of opinions that deal specifically with these driver's license type checkpoints, but they differ from Terry stops in a way that we think is very important. But I'm focusing on the immigration checkpoint law that she embraced, because if you're saying that that's a valid use of that law, I would have thought border immigration checkpoints do allow inquiry as to every single passenger's identification. Immigration checkpoints do our position would be for. So then why are you saying that the law is similar? Well, it's similar in the sense that the reasonable suspicion inquiry and analysis is similar in that in an immigration checkpoint context, if if if the officers have checked everybody's documentation and is satisfied that everybody looks good. Yet they continue to question them or continue the encounter beyond. I'll tell you where I am here because it seems to me once the officer sees a non nationals passport, a woman at midnight. And if we credit the district court's fact finding that it didn't have a valid entry, it would seem to me at that point there was reasonable suspicion of trafficking. So for me, the case all comes down to whether or not Officer Minga could say whatever he said that pertained to the backseat passengers. So my question is, do you have any checkpoint law that doesn't allow an officer in a suspicionless checkpoint context for from asking anything relating to a passenger? In the context of checkpoint law. No, I don't. Immigration of immigration. Yes, we should adopt as a rule of law in that regard. An officer doing a checkpoint can only inquire of the driver, even if they are importantly looking at seatbelts as to others. The state rule of law, the stated programmatic purpose of the stop. Our position is that's what should drive should drive the rule. And the stated programmatic purpose of the stop, according to Trooper Bell, was to check driver's license, make sure everybody's buckled up. One does not require checking identifications of passengers in order to make sure that they're buckled up. But in your in your office, in your motion to suppress, you did state that the scope extended to finding out the ID of the passengers, didn't you? I I'd have to go back and review it, Your Honor. I may have in our position on in general here is that there are two inflection points. One that occurs before the the basically as they are seizing the backseat passengers identification and one after they have asked these questions of Mr. Molina in conjunction with taking those things to distinct and identifiable inflection points that occur before the second vehicle comes in. Before we know anything about conflicting statements between the two. And our position is if if at either of these points there the purpose has been set satisfied and as far as the driver's license and seat belt purpose, we know those things were satisfied and satisfied almost instantly that even if we're talking about a relatively short period of time between these inflection points and when the inconsistent statement comes from the second driver, that even if that's short, that that's an unlawful seizure. If that first inflection point, the only thing that is known, and this is at the point where he is taking the two identifications from the backseat passengers and has already taken. And by the way, determined to be a valid driver's license from Mr. Molina. Now, there was their counsel. You please try to look at that and thought, why do you say that that the officer had determined it was valid? Was it not a temporary driver's license? It was a temporary driver's license. Did the officer ever say, is there record evidence? The officer said, I had no, I thought it was completely valid. I understood that. We just not don't know that. He he during the preliminary hearing, as well as the suppression hearing, he was asked multiple times about the driver's license. He stated that my recollection was that he stated that that it appeared to him to be valid. He had no reason to believe that the driver's license was invalid. Now, are you quoting him or are you just giving an overview of what you think he was saying? I mean, did he actually say I had no reason to worry, doubt, suspect the license? I don't remember. In the hours of testimony, the trooper bell gave between the preliminary hearing and the suppression hearing, I don't I don't think Mr. Trooper Bell at any point suggested that it was an invalid driver's license from from Mr. Well, I made it harder for you, but see if you can't return to your answer to Judge Higginson's question. Yes, Your Honor. Again, it's it's the reasonable suspicion inquiry, and it's whether these troopers had reasonable suspicion at these particular moments. And at this first moment, when the driver's license has been handed to Trooper Minga, I believe it was from Mr. Molina, it appears to them to be valid. Again, the four cars in front of them were there in this checkpoint were there for 18 seconds, 45 seconds, 12 seconds, even four seconds, which seems remarkably fast. But it does make some sense, given the stated purpose, at least Trooper Bell's stated purpose. If all the purpose of this is, is to make sure everybody's buckled up and look at a driver's license that can happen in just a few seconds. I thought the district court cites the Second Circuit burn a set decision. Do you remember that case?  I may be wrong, but I thought the Second Circuit just sort of said, you know, as a rule of thumb, we're going to go one minute per passenger. Would you have a problem with that? I would, Your Honor. Our position, particularly in the context of this, of these types of driver's license checkpoints. I think in a driver's license checkpoint, you're talking about an even shorter time than the short time that is authorized in an immigration checkpoint. Because, again, this is not me who made up the rules. Surely the officer has the time to go and actually run the driver's license, correct? Well, a lot of the legality of these of these types of checkpoint stops kind of hinges on treating all the cars the same. The courts, when looking at this, have been concerned about the fact that people coming through the checkpoint might be treated differently. I'm just your time's running out. You have not ever argued that the underlying checkpoint is invalid. I don't believe I don't believe you've argued that the first six cars were treated differently. For me, the difficulty in this case is it does. I'm not I have. Obviously, I'm open minded, but because I'm not no fan of suspicion, this stops. But it seems artificial to say that even at a checkpoint, the officer can't ask questions as simple as who's in the back. That doesn't seem to be prolonging or even investigating. That's just like asking him, where are you from and where are you going? Which you haven't disputed as a valid inquiry here. It's not just the asking of the questions. It's the asking of the questions in conjunction with the fact that these folks weren't free to leave. They didn't. They had their driver's licenses and identification. Sees no reasonable person would have felt. But once you get there, I think you're this is going to be a hard case for you to win, because once he has her passport, at least to my eye, he's got reasonable suspicion. If we credit the district court that it didn't have a valid stamp. So it's got to be that he couldn't even wait for the window to come down and get handed the passport. And I'm wondering, is there any law that says that I'm not aware of any explicit law that says that with regard to these these these driver's license checkpoints? But we do think that this is a situation where, again, there's a real question here about whether or not it was real. It was proper and lawful for them to even get to the backseat passengers in the context of a driver's license checkpoint. Yes, I agree. And the second inflection point that we identify, which also comes before the the second car and the inconsistent statements, which I acknowledge is the first obviously suspicious thing that happens in this entire encounter, are after he has been subject to this interrogation, some 13 or more questions where you not only related to his itinerary, but who is this guy you're going to see? What does he do for a living? What are your parents maiden names? Those types of questions are not reasonably related to the programmatic purpose of the stop, which had already been satisfied, nor are they related in a reasonable way to the suggestion of human trafficking. Now, we we we don't really accept the strange credulity from our perspective that this whole notion of human trafficking, which ended up being very central to the district court's finding, is a valid consideration here. There was a nearly four hour preliminary hearing where Trooper Bell was asked questions by attorneys for all seven or so of these defendants, at least four asked questions, three people from the first car and at least one from the second. What was suspicious about this? What was it that made you that made you concerned about the seating arrangement or whatever? And he never once said anything during the preliminary hearing. Or was that a magistrate magistrate? So Brown had a six hour suppression hearing and the magistrate had a four hour preliminary hearing. And even at the suppression hearing, and this is Trooper Bell at one point, even basically acknowledged that there wasn't anything there at these inflection points that we're identifying. He was asked at the suppression hearing at any point. Did you consider whether or not these defendants were just innocent travelers traveling from Florida to Memphis, as they stated? And he said, and I quote, until the stories of both drivers didn't match up, really not much at all. Just late night kids driving north, end quote, and really not much at all. Just late night kids driving north. Our position is that that that in no way satisfies the burden of reasonable suspicion necessary to to expand the scope and the temporal nature of this stop. I've reserved five minutes for rebuttal and I see that I'm running out of time. And if it pleases the court, I would reserve that five minutes. All right, counsel. This is a serious case and not in any way making light of it. But I've been seeing Mr. Roberts picture for the last 15 minutes. What is that behind your desk? Well, I've got up high is the Ole Miss baseball stadium, Swayze Stadium. That's all I need to know. Looks like a stadium to me. It's it was painted by. He was an ex ex coach and center fielder. But anyway, please, the court, Paul Roberts, assistant U.S. attorney. I was there as was Mr. Davis for the preliminary hearing, the suppression hearing, all of the hours and hours before. So the the safety stop was not just about driver's license. It also involved, obviously, safety seatbelts, insurance and registration. That was obviated when he announced the driver announced that the Toyota was a rental car. But there were other factors. There were other issues being taken into account. This is in the Golden Triangle area about midnight. The really the only thing close within a couple of miles of that would be Mayhew, Mississippi, where the I guess last chance university community colleges, I think. Some other things in that area, but pretty very rural area. As the court noted, there were seven or eight vehicles beforehand that lasted stops lasted from four to 88 seconds. About 25 seconds into the stop after the troopers see the seating arrangement, the second car drives up. Twenty five seconds after the stop, the second car comes up. That's that's the that's what the record reflects. And at that point, there is a questioning about if they're traveling together. One driver says they are. The other driver says they're not. They're both from Florida plates, both rental vehicles, both Venezuelans, whatever that matters. But in that initial twenty five seconds, the officer sees the seating arrangement and that becomes sort of the focal point of the initial stop. Now, didn't become and wasn't really discussed at length during the preliminary hearing because after the initial stop. Then there is the second vehicle driving up. There's the conflicting stories. And it becomes in the officer's mind more of a drug trafficking situation than human trafficking situation. But by that point, he has the backseat passengers passport without a valid entry stamp. And so as this court held for the Volkswagen, the second vehicle pending the Fifth Circuit held regarding and found regarding the stop of the Toyota driven by the co-defendants. Officers noted it was traveling about eleven fifty. Front passenger was vacant. Backseat was occupied by two persons. The driver had a temporary driver's license. Vehicle was registered in Florida. But, you know, I'm going to just quickly interrupt because I thought the brief was commendable and that you're not saying the temporary license or the midnight or the no one in the front passenger seat. That constellation of factors gets reasonable suspicion. I don't think you were. And I think you also did not claim that this is relinquished because below to the district court, they said that the inquiry could go to the occupants licenses. So am I right that this whole case turns on whether an officer at a suspicionless checkpoint stop can ask passengers questions? Is that what this comes down to? Well, and again, there's not a lot of case on it. But I think that it's clear that there's got to be some leeway for an officer to look at the situation and ascertain or try to ascertain what happens. And if the Second Circuit and I don't have the case in front of me says a minute, a passenger, that's probably right. I'm also thinking of the court's recent case was argued in Oxford in front of your honor. Judge Higginson, the U.S. versus Corey Smith case where they asked. And that's a traffic stop. The vehicle has a driver. I'm just going to interrupt because I don't think reasonable suspicion case. I don't think traffic stops are pertinent because nor do I think. But I'd love to hear you disagree with me that immigration stops are because each allows officers to ask lots of preliminary chit chat questions. Where from, where to. But checkpoints sort of exist on their own. Our court in the Supreme Court have been very, very suspicious of suspicionless stops of U.S. citizens. So I guess my difficulty here is twofold. One is not something challenged, which is was there any prewritten protocol for this checkpoint, which I thought was a Supreme Court requirement? They're not challenging that. But I I'd love to know what the rule of law is that you urge at a checkpoint stop. Can police ask? It doesn't make sense that you can ask for the licenses of passengers because passengers don't even have to have their licenses with them. So why wouldn't we say that the rule of law is passed? All questions have to focus on the driver only, but for a visual to confirm seatbelts of passengers. Why isn't that the rule? And I guess maybe I'm not saying that the. I'm trying to figure out a way to explain my thought process. I think that in a situation you have to give an officer the leeway to look at a situation, see the funny or strange seating arrangement and ask a question or two to figure out what's going on with that. Traffic stop is for seatbelts and license. Who cares where people are sitting? That sounds more like a you're getting a hunch. Something's wrong. But go ahead. I'm sorry. No, no, no, no. I'm I'll stop. I'm asking too many questions. You keep going with your presentation. Can I can I ask, though, are you do you agree with me that immigration checkpoint law is not relevant because there you can ask a lot more? I hate to say that's not relevant, Sean, because I think in those circumstances, there's the case where the, you know, the court went through all of the factors that can be reasonable. It could be a car riding too high, a car riding the same height, car riding too low. An officer has to be able to have at least some within twenty five to thirty seconds to kind of look at a situation and go. If I've got human trafficking and if I need to at least ascertain that this woman is is free. And so I think you have to allow that even in a safety checkpoint, because, I mean, and there was a written protocol. It's not being challenged, but I think there was testimony that there was a protocol in place. Oh, good. That's particular. That's my recollection. But I don't I don't have a record site to it. So I think we ask you if you have agreed with Judge Higginson about something. He has been causing calling this a suspicionless initial stop was. But though your briefing is your brief is good. I'm not sure that you have conceded maybe misreading my colleague all that he said you have conceded. What are you claiming and then support it? What suspicion was developed, if any, to the officer prior to having any kind of request, whoever made it to the backseat passengers? Was there suspicion yet of something reasonable suspicion, preferably in your position, I guess? And if so, on what is that based? And if you say there is none, then we'll move on. I think. And the court in ruling on the Volkswagen stop made findings about arguably in dicta, I suppose, that the late hour, the seating arrangement. And and then the driver's license, I think, combined, maybe not to be a reasonable suspicion, but a certain point where you get the the passport from the female in the back without the valid entry stamp. It certainly becomes that. And I think that's a valid. You're able to ask that. Well, while you may not be entitled to ask that in certain circumstances, the fact that that happens within a minute here, I think is reasonable for the for the officer then to allay that suspicion and figure out what's going on. Also, your your friend on the other side talks about two inflection points. I'm not. I'll accept that terminology. So what I'm trying to get from you, nothing to do with the second car that's come up, nothing to do with which is one of the early things you started with it, with a difference of what the drivers are saying about about their travel arrangements. Before anything is done to the backseat passengers, it seems to me what's happened is is a location, whatever to make of this highway. There is the temporary driver's license and there's whatever the officer can see, which is the seating arrangement and anything else you want to identify. Is it your position that that is creates reasonable suspicion of something that would allow looking at the identity of of the backseat or starting to engage the backseat passenger? I think it is your honor. I do think that that point that those factors combine to at least allay those suspicions. And I think it's articulable. What's the. Well, I mean, this is what suspicion, the suspicion that the woman is either human trafficking or being held against her will back passenger. And so and the cases side of the Eastern District of New York case where they're looking for illegal taxis doesn't say that it's not a factor. It says it's a one of a number of factors. And that's what the case that the district court cited as well, that that's one of a number of factors that can be realized or thought about by an officer. Now, that's that the 11th Circuit Beale decision, Beale, and then the Eastern District, New York case. It was interesting. Beale described factually the backseat, but didn't say it was a factor leading to reasonable suspicion. But maybe that Second Circuit district court opinion explicitly said, if you have an empty front seat, that's reasonable suspicion of of human trafficking. No, it says it could lead to it's one of the factors that could be a reasonable suspicion, articulable that could create an articulable reason. So the suspicion of what could be. Well, in that case, they were looking for illegal taxis. Legal what taxis. That's the New York medallion system and all that. That's what's going on in that case is my understanding. So they see they see a Crown Victoria. They realize a lot of taxis are Crown Victorias or bigger vehicles. They see the odd seating range where they stop. The district court says that factor alone isn't sufficient, but can be when considering the totality of the circumstances. Wow. OK, so I do think, you know, in looking at a situation, I think the officer has a right or should have the obligation to dispel that situation that arises and is visible in the first seconds that the seating arrangements are the hours odd. And so I think that's what's going on there. Once the once the passports produced, I think that is certainly articulable. Of course, then when the second vehicle arrives and the and the discrepancies arise, then it becomes more of a drug situation. There's no authority requiring the officers to ignore something like the seating arrangement is there. Not that I'm aware of. And I think for safety of the passengers, I think they've got an obligation. If they think there's something going on, they're human trafficking held against their will. It's a dereliction of duty to let them go on would be my argument. So, I mean, they have to ascertain you have to give officers the chance to figure out what's going on in order to ensure safety, not just to the driver. But also the other passengers in the car. So I think the officer acted correctly in the circumstance. I'm happy to answer other questions. Ask you on the time you mentioned whatever number of seconds it was. Twenty five seconds. The other vehicle shows up. Is there a clock on all of this? Do we know at what point after the first encounter with the driver? How many seconds before there's any inquiry of the backseat people? My understanding is all of that happens within the first twenty five to thirty seconds. The court had said your understanding. What's that based on? Is there is there based on. OK, the stops themselves were recorded and provided to the court. The and off and Judge Brown listened to and considered the testimony at the suppression hearing. She reviewed pretty carefully the tapes and made the findings in her order about that and also listened to the preliminary hearing or testimony. And so she based her ruling, the 22 page order on those three sources. But there was a there was audio video tape of the stops being conducted from the dash cam of one of the on of the trooper vehicles. Mr. Davis has already rejected this as a possibility. But at least something the panel may consider is just how brief were. Was this encounter before anything more substantial arose? Not necessarily a hard rule. One minute's good. One minute, one second's not. But if this all happened in less than a minute, that may or may not be relevant. Is that all you have, Mr. Roberts? Yes, your honor. Unless the court has. And just you do have a little more time. So I thought you've got just you've got me with if the past. Well, first of all, at the preliminary hearing, Officer Minga Bell didn't say that Minga saw the passport was bad. But is it an established fact finding of the court that it didn't have a valid entry stamp? Is that where we are? That's the finding, your honor. And that's that was the testimony at the suppression here. OK. And it's irrelevant to the dog that did alert. In the end, there was no car narcotics in the dog. Dog just alerted. And boom, there we are. Right. That's correct. You know, to me, the argument that somehow that's an invalid drug hit is is just wrong. I mean, the drug, the dog hit. Yeah. The fact that you don't find drugs doesn't mean the odor wasn't there. So I think that is a valid. Right. So you've got, again, just to repeat where I am, because I'm struggling. And this would be very significant because the Fifth Circuit hasn't issued a driver's license safety checkpoint case. So it's really important for us to get it right as to how far police can go. Do I under I'm I do think reasonable suspicion existed once the passport was turned over. Clearly, when the second car comes up, that's just my view of this case. My difficulty, I'll say again, is can officers at a suspicionless checkpoint make inquiry about passengers? Now, I want to understand your position. Do you not accept the premise? And you say, yes, there was reasonable suspicion by virtue of the midnight hour and no one in that front passenger seat. Or do you only say reasonable suspicion emerged when the passport was handed out? But you think it was such a quick amount of time that it is irrelevant whether the officer prompted that passport to be handed out. Which is your position? I think you're on the ladder. I think the fact that it all happens within the 25 to 30 seconds the court found. And so I think but but I think I can also see pretty clearly an answer to Judge Clement's question. I think the officer has to be able to look at a situation, ensure the safety of the passengers, not just from a driver's license once it's visible. Yes. But there you quickly you use the word the safety of. And that presumably just means confirming belts are on. Do you agree with me that passengers don't even need to carry licenses? You agree? Yes or no? I agree. I don't think they have to have licenses. And in your brief on page 17, do you remember saying that your view is that Officer Mingo was, quote, the driver's licenses of the occupants, plural. I'm sure I said that, Your Honor. OK, so therefore, you do think that at a checkpoint, the officer, according to your brief, can verify the licenses of all occupants. And I'm asking what's your authority for that proposition? Your Honor, I guess I'm basing that on on traffic stop and immigration point law because there's not a lot of law on this. But, yeah, well, you say driver's license. It seems to me another way to address that is to verify the identity. They don't need to be drivers, but they some sort of identification. But I'm obviously adding to it. Let me make sure I understand something you said. Mr. Rob, Mr. Roberts said to that other fellow, Judge Higginson. You seem to be saying that there may not have been suspicion. Based on what was visual before, do Officer Mingo before asking or before whatever happened, we really don't have a fact finding whether Officer Mingo asked. We do have sort of conflicting evidence on that from Bail as to what Bail said actually happened. But is there some level of suspicion lower than reasonable suspicion that you're saying arose from what was visually apparent? And the officer was in a fairly short period of time. It existed, at least could pursue that where he couldn't have if he didn't have this lower level of suspicion. I mean, I really do feel like we're in uncharted waters if we do something like that. But that's sort of what I heard. In addressing a situation, I think the officer has some ability to act a certain amount on a hunch to ascertain the safety. I think that's eliminated once the passport's in hand. But for the safety of the passenger, I think there's got to be some right for an officer to not just to try and verify the safety of a passenger beyond just a driver's seat belt. But I'm not sure. I don't want to call it a hunch. I don't want to call it anything less than reasonable suspicion. I think the circumstances together. But again, it happens within 25 to 30 seconds, so I'm not sure that it causes any substantial delay to the rest of the safety reasons for the stop in assuring driver's license registration and those items. So it's a hard case in that level because I think there is something that is a little less than articulable reasonable suspicion. But within 25 to 30 seconds, I think it's established because of the other factors. The timing, the location, the foreign nationals, the seating arrangement all combines, and that's all evident within the 25 to 30 seconds. All right. Thank you. I'm sorry. Go ahead. Thank you. We'll hear from Mr. Davis and rebuttal. You're muted, Mr. Davis. The better. Okay. A little better. Thank you, Your Honor. I hear my friend, Mr. Roberts, say that the officers ought to have the authority to act on a hunch if it falls short of reasonable suspicion. And that may be the policy argument he's proposing, but I don't think that's what the law says. He has acknowledged that this maybe was not reasonable suspicion, at least the confluence of factors that was available once Mr. Molina's license had been checked and everybody had been visibly verified to be wearing a seat belt. At that particular point, yes, I know we're talking about a relatively short period of time between that and when the car pulls up and then some minutes later when there's a conflicting statement. But at that point, if Mr. Molina and his passengers are not free to leave and are not reasonably free to leave, then they are seized under the law. And if that seizure is not justified by all that Mingus said was who's in the back, that doesn't tell us he'd even verified they had seat belts on. He's just saying, is there anyone back there? It's midnight. Right. And then they hand out the passport. At least according to some of the testimony in the first hearing, I'm not I didn't take who's in the back to mean do you do you have anybody back there? I'm assuming a driver who's standing or a trooper who's standing at the driver door can see that there are passengers in the back. I took who is who is in the back to be a request for Mr. Molina to identify his backseat passengers, which already goes beyond the programmatic stated purpose of the stop. What's wrong if it's twenty five seconds? You don't dispute that Mingus was able to ask the driver where are you coming from? Where are you going? That's OK. Right. At a checkpoint at a driver's license checkpoint, if the driver's license is valid, I think I think if he's doing that while he's looking at the license with this in the first few seconds, where are you coming from? Where are you going? Might be OK. OK, so now that's OK. But then I think I'm right that the answer was I'm coming from Mississippi and yet he was actually still in Mississippi. Why isn't that another factor like this guy? He says he's coming from Mississippi, but he's actually in Mississippi. I could see myself doing that because I don't know where Mississippi starts and stops. But that's a little bit of a concern for the police officer. To some degree, though, Trooper Bell admitted himself that that was alleviated pretty quickly. It seemed to be this English is not Mr. Molina's first language. He was speaking English as a second language to. Right. But I guess what you would mean alleviated quickly. We know the passport comes out really quickly. There's twenty five seconds till the second car. That means the passport's coming out of the window within 10 or 15 seconds. He doesn't oblige to say no, no, no, no. I can't look at that. No, I don't think he is necessarily. Again, we have it. Trooper Bell testified explicitly during the suppression hearing that that they asked for those licenses. And again, the record isn't entirely clear. Mr. Roberts suggests that that there has to be a dereliction of duty was his line not to follow up on this idea of of human trafficking based on this confluence of factors. Our position is if that were true, then the invest the questions that followed would have to be somewhat reasonably related to the idea to dispelling the notion of human trafficking. And they weren't. They were just an interrogation of Mr. Molina and where he's going and who his family members are. And this different variety of things. Mr. Trooper Bell said two different things. He said a lot of things. But there are a couple of things in particular that are that are as telling as anything. I quoted during my during the first 15 minutes when he said up until the stories of both drivers didn't match up, really not much at all. Just kids driving north. That is a tacit admission by Trooper Bell that there is that there was no reasonable suspicion until that point of conflicting statements. And when asked at the preliminary hearing, wasn't the purpose of the stop satisfied? Once you had a once you had the apparently valid driver's license, he stated, and I quote, from what I do with the highway patrol, my stop goes a little bit further. Asking travel plans. Why do we refer to the preliminary hearing? That's in front of the magistrate. Right. Judge Brown, do we know that she the evidence that she had the six hours from the suppression? And here's my question. Isn't it very significant if we don't know exactly what he asked and that's what's holding me up? Wouldn't it be very significant if in your motion to suppress, you said the scope could extend to asking them licenses? That would explain why she didn't make a fact finding, because you didn't say that was relevant. Perhaps. So, Your Honor, the transcript of the preliminary hearing was attached to an exhibit of that hearing. I know that that was a it was a consideration in the record for the court at that time. But Trooper Bell stated, it's just what I do with highway patrol. It's interdiction. Criminal interdiction is what I do. OK, that was page four or two of the preliminary here. All right. Then, counsel, we thank you both for your helping us with this case. And you, my colleagues, have something else you want to add before we say goodbye to them. Where does Mississippi start and stop? Judge Suffolk, this is going to take a while. We don't need to hold up our advocates this morning. You come up here sometime and I apologize to Mr. Davis for not commenting on what's behind you. I don't see anything behind you. Thank you. We are. We are adjourned under the usual order, whatever that is.